# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8514 | **DATE** | 5/15/2003 |
| **CASE TITLE** | Louis A. Papp vs. Midwest Physician Group Ltd., | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant's Motion for Summary Judgment is GRANTED and this case is DISMISSED in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | MAY 16 2003 | |
| | Notices mailed by judge's staff. | | date docketed | |
| | Notified counsel by telephone. | | | 39 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | ED-7 FILED FOR DOCKETING 03 MAY 15 PM 3: 19 CLERK COURT | date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAY 1 5 2003

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

LOUIS A. PAPP,

                Plaintiff,

      v.

MIDWEST PHYSICIAN GROUP LTD.,

                Defendant.

Case No. 01 C 8514

Hon. Harry D. Leinenweber

**DOCKETED**

MAY 1 6 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Louis A. Papp ("Papp") brings this complaint against Midwest Physician Group Ltd. ("MPG") alleging disparate treatment in violation of the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. § 621, *et seq.* Presently before the Court is MPG's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the motion and dismisses this action in its entirety.

### I. BACKGROUND

This action arises out of a reduction in force ("RIF") that MPG, a not-for-profit corporation that provides medical services at clinics in and around Chicago, implemented in the spring of 2000. Up until that time, five physicians had worked full-time in MPG's pediatrics department, Papp among them. As part of the RIF, MPG elected not to renew Papp's full-time employment contract which was set to expire on June 30, 2000, and instead offered him a half-time "hospitalist" position. Papp refused MPG's offer to convert his employment to half-time, and was therefore terminated as of June 30,

2000. Papp was 50 years of age at that time. MPG claims that its decision not to renew Papp's contract and to instead offer him a half-time position was motivated by its "need to 'rightsize' MPG's pediatrics department by reducing the number of physicians employed in that department in order to cut costs and alleviate the department's ongoing financial difficulties." (Def.'s Mem. at 3.) Papp, on the other hand, contends that the decision was the result of age-based animus.

MPG's pediatrics department began to experience financial difficulties and run deficits in 1999 (and perhaps as early as 1998). To help meet this problem, in June 1999 Dr. Rita Mathewson, chairperson of the pediatrics department, considered downsizing the department from five full-time physicians to four by June 30, 2000, the end of the next fiscal year. (Pl.'s Resp. to Def.'s Statement of Facts ¶ 64.) In a further effort to alleviate some of the department's financial problems and to avoid the potential necessity of downsizing, in July 1999 Mathewson herself took two pay cuts (the first of which totaled $30,000) and also reduced the salary of each of the other pediatric physicians by the amount of his or her respective malpractice insurance premium. (*Id.* ¶¶ 65-66.) In addition, in November 1999, one of MPG's outpatient clinics was "opened to receive Medicaid patients in an effort to enhance revenue." (*Id.* ¶ 67.)

Notwithstanding these cost-cutting efforts, by early 2000 the department was running a deficit of more than $600,000. An analysis performed at that time by Deborah Nelson, MPG's chief financial

officer, revealed that (i) the volume of patients being seen by the department could not support the number of physicians employed, and (ii) the most significant expenditure within the department was physician compensation. Based on this data, Mathewson and Nelson concluded that the number of full-time physicians needed to be reduced. MPG separately considered eliminating one or two full-time physicians, but these alternatives were each rejected, the former because it would not have fully eliminated the department's deficit, and the latter for fear that the physician staff would find itself overburdened. Ultimately, Nelson and Mathewson concluded that the most financially sound option was to reduce the pediatrics department from five to 3.5 full-time physicians and to increase the department's patient base. (Pl.'s Resp. to Def.'s Statement of Facts ¶¶ 72-73, 83.) In effect, the planned reduction in force meant that one full-time physician position would be eliminated, and one of the formerly full-time physicians would be converted to half-time. Nelson, with Mathewson's endorsement, recommended this course of action to MPG's finance committee and its board of directors, and received final approval from each of those bodies on March 28, 2000.

MPG claims that Mathewson was solely responsible for developing a plan for implementing the reduction in force by selecting the particular physicians that would be downsized. Papp contests whether Mathewson was "solely" responsible for this decision. (*Id.* ¶¶ 17, 94.) In any event, MPG contends that Mathewson had five physicians from which to choose: herself (age 39); Papp (age 50); Dr. Cathy Macyko (age 40); Dr. Michael Jakubowski (age 43); and Dr. Narges

Razavizadeh (age 56). Mathewson considered each to be a fully competent, exemplary physician who was a good educator and who provided quality care to his or her patients. MPG states that Mathewson selected Razavizadeh as the one full-time reduction based on geographic considerations and the department's on-call requirements. MPG further states that Mathewson created a half-time "hospitalist" position which would involve one of the formerly full-time physicians in the department taking responsibility for MPG's inpatient neonatal services, deliveries and teaching duties at St. James Hospital, while the remaining three full-time physicians would be responsible for seeing patients at MPG's three outpatient clinics. According to MPG, utilizing a half-time "hospitalist" in this way along with the three remaining full-time physicians would maximize the department's productivity and revenue.

In selecting a suitable candidate to recommend to MPG's finance committee and board of directors for the hospitalist position, Mathewson considered a number of factors, including qualifications, special certifications, availability and other job responsibilities. Of particular importance to the hospitalist position would be the ability to handle neonatal emergencies as well as to provide other more routine neonatal services. Of the four physicians remaining after Razavizadeh was selected for termination, MPG claims that Papp was the best and most obvious for the hospitalist position, as he was the only physician in the department certified in neonatology. According to MPG, other factors also pointed to Papp as the best candidate, including: (i) the teaching aspects of the hospitalist

position, which were thought to mesh well with Papp's expressed enjoyment of teaching in a patient setting; and (ii) the fact that the hospitalist would primarily work morning hours, which fit Papp's scheduling preference.

MPG also notes that Mathewson believed that Papp, while he had been a full-time physician serving in the Olympia Fields outpatient clinic, had been engaging in questionable scheduling practices which involved inserting fictional patient names into Wednesday afternoon appointment slots. Mathewson believed that Papp was "blocking off" his schedule in this way so that he could leave the clinic on Wednesdays before his scheduled time of 5:00 p.m. (*See* Mathewson Dep. at 79-81.) Mathewson was concerned that this scheduling practice, combined with Papp's general preference for arriving early and leaving early, would compromise his accessibility on Wednesday afternoons (many pediatric patients prefer afternoon, after-school appointments), and could in turn hamper MPG's plan to increase revenue. Mathewson, who had been trained and mentored by Papp while she was a young doctor, found it difficult in her role as chairperson of the pediatrics department to confront Papp about these scheduling irregularities, and she hoped to avoid the issue altogether by offering Papp the inpatient hospitalist position, which primarily required morning hours and would not have involved an outpatient appointment schedule. (*See, e.g., id.* at 84-85.)

As previously noted, on March 28, 2000 MPG's finance committee and board of directors approved Nelson and Mathewson's proposal to reduce the pediatrics department to 3.5 full-time physicians. It was

then time to deliver the bad news to the affected physicians. Given the pre-existing mentoring and training relationship between Papp and Mathewson and the fact that Mathewson "held . . . and continue[s] to hold [Papp] in very great regard" (Mathewson Dep. at 85), Mathewson found it particularly awkward to communicate to Papp the decision not to renew his full-time contract, so she asked Dave Thomas, MPG's chief executive officer, to do so. On March 30, 2000, Thomas conveyed the non-renewal decision to Papp and offered him the half-time hospitalist position. (Pl.'s Resp. to Def.'s Statement of Facts ¶ 163.) Papp refused to accept MPG's offer, and his employment therefore came to an end on June 30, 2000.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Supreme Court has emphasized "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue [of material fact] for trial." *Id.* at 249. In performing this

task, all factual disputes are resolved, and all reasonable inferences are drawn, in favor of the nonmoving party. *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002). However, "[s]elf-serving assertions without factual support in the record will not defeat a motion for summary judgment." *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994).

The burden is initially upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the moving party believes demonstrate an absence of a genuine issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest upon the mere allegations contained in the nonmoving party's pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). Accordingly, summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In such a situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

## B. ADEA

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "[L]iability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). Age must have had "a determinative influence on the outcome" of the employer's decision-making process. *Id.*

"A plaintiff can establish age discrimination through direct evidence, or more commonly through the burden-shifting method of *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973)." *Beatty v. Wood*, 204 F.3d 713, 716 (7th Cir. 2000). "'[D]irect evidence' is defined as evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)(internal quotation marks omitted). Direct evidence consists of "smoking gun remarks indicating intentional discrimination" along the lines of "I fired you because of your age," *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000), or other "employer statement[s] that reveal[] hostility to older workers," *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1420 (7th Cir. 1992). Predictably enough, "[d]irect evidence . . . is rarely found." *Castleman*, 959 F.2d at 1420. "To prove age discrimination using direct evidence, an ADEA plaintiff must establish that he would

not have been discharged 'but for' his employer's motive to discriminate against him because of his age." *Mills v. First Federal Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 840 (7th Cir. 1996) (internal quotation marks omitted). "[S]tatements which constitute direct evidence of discrimination may come from either an employer or his or her agents." *Mills*, 83 F.3d at 841.

If an age discrimination plaintiff is relying instead on indirect evidence, he must proceed under the burden-shifting methodology of *McDonnell-Douglas*. "First, the plaintiff must establish a prima facie case of discrimination," *Reeves*, 530 U.S. at 142, which entails "show[ing] that: (1) he was over forty years of age; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated, substantially younger employees were treated more favorably." *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, at 771-72 (7th Cir. 2002).

> If the plaintiff succeeds in establishing a prima facie case, this creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for age discrimination.

*Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir. 1994). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against

the plaintiff remains at all times with the plaintiff." *Reeves*, 530
U.S. at 143 (internal quotation marks omitted).

For an employer's "reason to be 'legitimate,' in the sense of
sufficient to rebut a prima facie case, it need not be a good or
sympathetic justification for what the employer did; it need only be
nondiscriminatory and . . . explain why the challenged action was
taken." *Mills*, 83 F.3d at 845 n.8. "A pretext, in employment law,
is a 'phony reason' that the employer offers for engaging in
discriminatory conduct (*e.g.*, firing an employee because of her age
and claiming it was for some other reason)." *Id.* at 845 (internal
quotation marks omitted). To prove that an employer's proffered
explanation for its employment action was merely pretext for age
discrimination, a plaintiff must prove by a preponderance of the
evidence that the explanation is "unworthy of credence." *Reeves*, 530
U.S. at 143 (internal quotation marks omitted); *see also E.E.O.C. v.
Our Lady of Resurrection Med. Center*, 77 F.3d 145, 149 (7th Cir.
1996) ("[P]retext . . . means a lie, specifically a phony reason for
some action." (internal quotation marks omitted)); *Castleman*, 959
F.2d at 1422 (to show pretext, plaintiff must demonstrate that
employer "made up" its reason). In attempting to show pretext,
"[t]he plaintiff must specifically refute the facts which allegedly
support the employer's proffered reasons." *Collier v. Budd Co.*, 66
F.3d 886, 893 (7th Cir. 1995)(internal quotation marks omitted); *cf.
Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002)
("Where an employer offers multiple independently sufficient
justifications for an adverse employment action, the

plaintiff-employee must cast doubt on each of them."). All that said, it bears special emphasis at the outset that it is _not_ the province of this Court to pass on the wisdom or fairness of an employer's business decisions. Indeed, as the Seventh Circuit has often cautioned, "[n]either the jury nor this Court is empowered to act as a 'super-personnel department' and decide if [an employer's employment decision] was unwise or unjustified." _Castleman_, 959 F.2d at 1422.

## III. **DISCUSSION**

### A. **Direct Evidence**

Papp claims to have offered up two pieces of direct evidence of age discrimination: (i) testimony by Mathewson, as an agent of MPG, "that she knew Dr. Papp was retiring at 55, and that she considered that fact in making the decision regarding his employment" (Pl.'s Mem. at 11); and (ii) testimony by Razavizadeh that Thomas "told [her] during her termination meeting, 'Maybe [it's] time you retired.'" (_Id._) Papp believes that this evidence "shows that age was a motivating factor in the decision to terminate Dr. Papp's contract." (_Id._ at 11-12.) When this evidence is viewed in its proper context, it is clear that Papp is mistaken.

It is worth reproducing here the actual dialogue that took place during Mathewson's deposition that Papp somehow believes constitutes _direct_ evidence of age-based animus:

Q:   I believe you testified that you were aware that
     Dr. Papp was intending to retire at age 55?
A:   Yes.

Q: And he freely discussed that in the department?
A: Yes.

Q: So everybody knew?
A: Yes.

Q: And by offering this half-time position, you were assuming that he would be able to exist on roughly half of his salary until age 55, correct?
A: Again, while the salary wasn't determined, the idea was not to hasten his retirement but simply to allow him to remain employed by MPG until such time as he chose to.

. . .

Q: And you were assuming that Dr. Papp would accept and live on that salary, that reduced salary until age 55 when he retired?
A: I was hoping he would consider that.

Q: And part of the reason in your mind that you thought that might be a possibility was because his wife was also a doctor, correct?
A: That factor, I think, would have helped.

Q: Was that a factor in your mind? That's my question.
A: Yeah.
Q: And the fact that Dr. Papp was – how old was he at the time in 2000?
A: I don't know. I don't know how old he is today.

Q: The fact that he was close to 55 was also a factor in your mind?
A: No.

Q: No?
A: No.

Q: The fact that he only had a few years to his intended retirement?
A: He could stay as long as he wanted to.

Q: That's not my question. The fact that he only had a few years to ride out before the age when he said to everybody that he was intending to retire, that was a factor in your mind as far as this offer to him?
A: No.

Q:   That it might be palatable; isn't it true?
A:   No.

Ms. Moore [MPG's counsel]:  Objection, asked and answered.

A:   No.  It was not related to that.  It was related
     more to the early morning hours and the
     neonatology and the teaching and I thought he
     would like the job.

Q:   But you also knew that he was going to retire,
     correct?

Ms. Moore:  Objection, asked and answered.

A:   I knew he wanted to retire at 55, yes.

Q:   And my question goes then to him, unlike the
     other physicians, factoring out Dr.
     Razavi[zadeh] being as close to retirement as he
     was, his freely spoken retirement age, and the
     fact that he had a spouse who was also a doctor,
     those were things you considered in offering
     this position to him, correct?

Ms. Moore (MPG's counsel):    Objection, asked and answered.
                              She already said no.

Q:   You can answer.
A:   No.  And I would qualify that by saying if any
     of the other physicians had the same
     characteristics of assumed financial security
     and training, they would have been considered
     equally.

Q:   But they didn't, correct?
A:   They didn't.

Q:   They didn't have the same characteristics?
A:   No, they didn't.

Q:   They didn't have the same personal circumstances
     as Dr. Papp, right?
A:   None of us do.

Q:   He was only a few years to retirement, correct?
A:   I guess so.  I don't know how old he was.

Q:   Well, in his discussions about retiring, were
     you left with the impression that it was just a
     few years away?  That's my question.

```
        A:   I would have thought it was within ten years,
             but anything more than - any more detailed than
             that, no, I don't know.  I honestly don't make
             it a point of knowing how old everyone is.
```

(Mathewson Dep. at 98-102.)

As this excerpt makes clear, Mathewson never testified that she considered Papp's age in *selecting* him for the half-time hospitalist position.   To the contrary, she plainly denies having done so. Mathewson explains that she chose Papp based on neutral factors such as the "early morning hours [involved] and the neonatology and the teaching."   While she may have known (along with the entire pediatrics department) that Papp intended to retire at age 55, this fact at most formed a basis for her *hope* that he would be *interested* in taking the position.   Indeed, Thomas's deposition testimony (to which Papp also points as direct evidence of discrimination) only corroborates this view:

```
        Q:   Do you ever recall any conversation with Dr.
             Mathewson where she discussed the age of any of
             the physicians in the pediatrics department?
        A:   Yes.

        Q:   What do you recall about that?
        A:   I recall that in my conversation with Dr.
             Mathewson prior to the meeting with Dr. Papp,
             she mentioned to me that, she was trying to
             explain to me the sales features or why Dr. Papp
             should like the offer that's being made to him.
             And she mentioned that Dr. Papp had made a
             number of public statements about the fact that
             he planned to retire when he was 55, and this
             offer would allow him to achieve that objective.
```

(Thomas Dep. at 30-31.)   As this testimony demonstrates, to the extent age played any role in MPG's employment decision in this case, it was in the very limited sense that it constituted a "sales feature" or a reason to believe that Papp would "like the offer

- 14 -

that's being made to him" and "would allow him to achieve [his] objective" of retiring at age 55. But the reasons underlying an employer's belief that a candidate may find a particular position appealing can be, as in this case they clearly are, logically and legally distinct from the grounds upon which an individual is selected for a position in the first instance. It would be an extravagant distortion of the record to say that the selections of testimony above constitute direct evidence of age discrimination, *viz.*, "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Cowan v. Glenbrook Sec. Svcs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997).

Likewise, with the testimony of Razavizadeh that Papp believes qualifies as direct evidence of discrimination. Papp alleges that Thomas "told Razavizadeh during her termination meeting, 'Maybe [it's] time you retired.'" (Pl.'s Mem. at 11) Razavizadeh's precise testimony was as follows:

> Q: Well, do you know who made the decision as to which physicians –
> A: Well, when I went to – when they call me in March 30 and they told me Mr. Dave Thomas wants to talk with me and I went over there, he told me that was not chairman [Mathewson's] decision. Really, she had the hard time to even think about any one of us is leaving. And they told her to be out of that. They are going to make the decision. And this decision is not doing anything with our performance or with anything, but that then they decide that I be terminated. And even the first day he gave me a lecture about how bad is the pediatric right now, and they are not making money and why people are

going to pediatric. And I remember I told him that's too late for me to change my career, but that he talk with medical student. And then he suggest me to get retired and said, "Maybe time you retired" [sic], and even said that she called Miss Shirley Miller [MPG's director of human resources] to give me benefits for my retirement. And I told him I don't think I am in a situation that I can afford to get retired. And that's my decision to get or not. And I know what's the benefit. And I said that's no benefit was there really. That's no benefit except that malpractice tail. . . .

. . .

Q:   . . . [W]ho was present for the conversation that you had with Dave Thomas?
A:   Just Miss Shirley Miller, that Mr. Thomas ask her to come and talk about my benefit before I get retired.

Q:   Are you talking about the separation benefit that MPG offers?
A:   Yes.

(Razavizadeh Dep. at 41-42.)

Even assuming that Razavizadeh's testimony is a fair and accurate representation of the conversation that took place between herself and Thomas (both Thomas and Miller have submitted affidavits swearing that it is not), it is abundantly clear from the record that Thomas made the "Maybe [it's] time you retired" comment in the context of discussing the comparative advantages to Razavizadeh of voluntarily retiring, which would have qualified her for a separation benefit, rather than having her contract not renewed. (See, e.g., Miller Aff. ¶ 20, Miller Second Aff. ¶ 3, Miller Dep. at 33-34 & Exh. 2, Razavizadeh Dep. at 41-42.) Communicated under those circumstances, Thomas's suggestion that Razavizadeh consider retirement as a more palatable option than non-renewal of her

employment contract simply does not constitute direct evidence of age discrimination. *Cf. Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 715 (7th Cir. 1999)(holding that, in connection with an RIF, employer's one-time question, "[w]hat would you think if we gave you early retirement, with some extra compensation because of your age? . . . does not reflect that [plaintiff's] age played a role in the decision to terminate him or that he would have kept the position if he were younger"); *cf. also Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 260 (7th Cir. 1997)(holding that employer's suggestion of retirement in lieu of termination did not comprise direct evidence of age discrimination).

In sum, the Court holds that Papp has failed to point to any direct evidence that creates a genuine issue of material fact as to whether MPG discriminated against Papp on the basis of age. *Cf. Liberty Lobby, Inc.*, 477 U.S. at 247-248 ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). Accordingly, Papp must proceed under the burden-shifting regime of *McDonnell-Douglas* and can only survive summary judgment by pointing to admissible indirect evidence that would allow a reasonable jury to find that he was a victim of age discrimination at the hands of MPG.

## B. Indirect Evidence

There seems to be no dispute that Papp has set forth the first three elements of a prima facie case under *McDonnell-Douglas* - he suffered an adverse employment action, was more than forty years of

age at the time, and was meeting his employer's legitimate expectations. MPG argues, however, that Papp fails to meet the fourth element in that he has failed to show that *similarly situated*, substantially younger employees were treated more favorably. MPG claims that Papp's medical qualifications, his penchant for teaching in a clinical setting, and his scheduling preferences plainly distinguished him from his colleagues in the pediatrics department. Because the "similarly situated" question overlaps substantially with the question of pretext, the Court will move immediately to that analysis. *Cf. Our Lady of Resurrection Med. Center*, 77 F.3d at 149-50.

### *1. Pretext*

MPG has articulated a legitimate, non-discriminatory reason for its decision not to renew Papp's contract, and instead to offer him the half-time hospitalist position, to wit: "the need to 'rightsize' MPG's pediatrics department by reducing the number of physicians employed in that department in order to cut costs and alleviate the department's ongoing financial difficulties." (Def.'s Mem. at 3.); *see Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 878 (7th Cir. 2002)(business-justified RIF is legitimate, non-discriminatory basis for employment actions); *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 694-95 (7th Cir. 2000)(same). In selecting Papp as the candidate best-suited to the hospitalist position, MPG, through Nelson and Mathewson, states that it took account of his particular skills, medical expertise, scheduling and work habits, and lifestyle preferences. *See Lesch*, 282 F.3d at 473 (skills,

- 18 -

qualifications and experience all form legitimate, non-discriminatory grounds for employment actions).

To survive summary judgment, Papp must point to admissible evidence in the record that would allow a reasonable jury to conclude that MPG's proffered reasons are unworthy of credence. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999); *see also Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002)(to withstand summary judgment, plaintiff must set forth "sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action"). To meet this burden, Papp "must offer evidence tending to prove that [MPG's] proffered reasons are factually baseless, were not the actual motivation for the [adverse employment action] in question, or were insufficient to motivate the [adverse employment action]." *Wilson v. AM General Corp.*, 167 F.3d 1114, 1120 (7th Cir. 1999)(internal quotation marks omitted). "These formulations are simply different ways of recognizing that when the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation." *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996). After all, "[i]f the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may rationally be drawn." *Id.*

In evaluating Papp's evidence, however, this Court remains well-cognizant that it "does not sit as a superpersonnel department that reexamines an entity's business decisions," but rather must simply

"determine whether the employer gave an honest[, non-discriminatory] explanation of its behavior." *Jackson*, 176 F.3d at 984 (internal quotation marks omitted). "In other words, if [MPG] honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless, [Papp] cannot prevail." *Id.* (internal citations and quotation marks omitted).

Papp goes to great lengths in an attempt to expose testimonial "inconsistencies" that he believes create a genuine issue of material fact on the issue of pretext. It is certainly true that "[a]n inference of pretext may be permissible . . . when decisionmakers make false or inconsistent statements about the circumstances of a particular employment decision." *Krchnavy*, 294 F.3d at 876 -877; *see also Castleman*, 959 F.2d at 1422 ("A jury's conclusion that an employer's reasons were pretextual can be supported by inconsistencies in or the unconvincing nature of the decisionmaker's testimony."). But a plaintiff must do far more than "create[] only a weak issue of fact as to whether the employer's reason was untrue," especially where there is ample independent evidence in the record that no discrimination has occurred. *Reeves*, 530 U.S. at 148. For example, "if the circumstances show that the defendant gave the false explanation to conceal something *other than* discrimination, the inference of discrimination will be weak or nonexistent" and summary judgment for the employer should be granted. *Id.* (internal quotation marks omitted)(emphasis supplied). Analyzing the supposed testimonial "inconsistencies" and "incongruities" to

which Papp points against this guidance from the appellate courts, it becomes clear that this case is much ado about nothing.

### a. Identity of Decisionmaker

Papp's primary evidence of pretext is that MPG has offered allegedly inconsistent testimony about the identity of the decisionmaker(s) in this case. (Pl.'s Mem. at 3, 13.) At paragraph 17 of MPG's Statement of Undisputed Material Facts, MPG claims that "[e]ach clinical department is led by a chairperson who is responsible for making all employment decisions relating to that department." As previously noted, Mathewson is the chairperson of MPG's pediatrics department. Papp claims that MPG is not telling a straight story as to whether Mathewson did or did not make the decision to downgrade Papp's employment to half-time. In support of this argument, Papp points to testimony he gave describing a June 2000 meeting between himself and Mathewson after he had been notified that his full-time contract would not be renewed. Referring to the discussion that took place at that meeting, Papp testified as follows:

> "I think she [Mathewson] told me that she wanted to make sure that I knew she had nothing to do with my going to half time or Dr. Razavi[zadeh]'s loss of employment, that she knew about it, but was unable to make the decision on a personal basis, and said that the decisions were made by MPG. . . ."

(Papp Dep. at 83.) Papp further points to the following testimony of Razavizadeh, who is here describing a portion of the conversation that she claims took place at the termination meeting between herself and Thomas:

Q:    Well, do you know who made the decision as to
      which physicians –
A:    "Well, when I went to – when they call me in
      March 30 and they told me Mr. Dave Thomas want
      to talk with me and I went over there, he told
      me that was not chairman [Mathewson's] decision.
      Really, she had the hard time to even think
      about any one of us is leaving.  And they told
      her to be out of that.  They are going to make
      the decision. . . ."

(Razavizadeh Dep. at 41-42.)

Neither of these selections of testimony creates a genuine issue
of material fact as to pretext.  With respect to the first selection,
it bears noting that Mathewson denies ever having said that she "had
nothing to do with [Papp's] going to half time or Dr. Razavi[zadeh]'s
loss of employment."  (Mathewson Second Aff. ¶ 12.)  Indeed, at a
later point in Papp's deposition, Papp himself concedes that his
conclusion that Mathewson "had nothing to do with [his] going to half
time" (Papp Dep. at 83) was simply his "interpretation of what
[Mathewson] said" (*Id.* at 141).  At that point Papp backs away from
his previously unqualified assertion that Mathewson had <u>no</u> role in
his employment decision, this time stating that Mathewson had told
him that "she was aware of the situation, of who was being released,
but that she could not make the *final* decision. . . ."  (*Id.*
(emphasis supplied).)  This characterization of the conversation fits
well with Mathewson's own deposition testimony: when asked whether
she had told Papp that she "could not make the decision, that it was
really MPG's decision or words to that effect," she answered that she
"may have expressed how difficult this was for [her]," how "this was
a horrible" to have to make, and that she "may have said this was a
joint decision."  (Mathewson Dep. at 89.)

- 22 -

Indeed, the record is abundantly clear, and MPG has consistently maintained, that multiple parties were involved in the overall decisional process that led to Papp's termination, and that Mathewson did <u>not</u> make the "final" decision regarding any cuts in personnel. Working together, Nelson and Mathewson initially concluded that the most cost-efficient solution to the pediatric department's financial difficulties was to eliminate 1.5 full-time positions. (Pl.'s Resp. to Def.'s Statement of Facts ¶¶ 72-73, 83.) Mathewson was responsible for selecting the particular physicians to recommend to the finance committee and the board of directors as candidates for reduction, though Nelson did act as a "sounding board" as Mathewson made those decisions. (Nelson Dep. at 26.) The overall reduction proposal (which included the suggestion that the department be "rightsized" down to 3.5 full-time physicians as well as Mathewson's specific selection of physicians that should be reduced) was presented to, and ratified by, MPG's finance committee on March 28, 2000, and was ultimately approved by MPG's board of directors the same day. (Mathewson Dep. at 110, Mathewson Aff. ¶ 39, Mathewson Second Aff. ¶ 13; Pl.'s Resp. to Def.'s Statement of Facts ¶ 158.) Surely this is what was meant when Mathewson allegedly said that "she could not make the final decision" regarding Papp's employment, or when Thomas allegedly told Razavizadeh that MPG, rather than Mathewson, was "going to make the decision" regarding Razavizadeh's employment – as in any corporate entity, the board of directors ultimately must (or, even where not legally required, are frequently called upon to) approve significant corporate decisions.

In pointing to these testimonial excerpts, Papp has as most created a very "weak issue of fact," *Reeves*, 530 U.S. at 148, about who the decisionmaker was in this case, an issue that seems to disappear when the testimony is reviewed dispassionately in the context of the overall record. *Cf. Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997)("A little common sense is not amiss in a discrimination case.") Moreover, even to the extent that Mathewson may have fumbled a bit in her conversation with Papp and misleadingly downplayed her role in the overall decisional process, on this record no reasonable jury could conclude that she dissembled for any other purpose than to ease the terrible awkwardness that she must have felt in discussing these matters with a person who had mentored and trained her as a medical student and with whom she had developed a friendship. (Def.'s Statement of Facts ¶ 108; Mathewson Dep. at 85); *cf. Reeves*, 530 U.S. at 148 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something *other than* discrimination, the inference of discrimination will be weak or nonexistent." (internal quotation marks omitted; emphasis supplied)).

### b. Scope of EEOC Position Statement

As further evidence of pretext, Papp claims that the testimony MPG's witnesses have furnished in this litigation is "inconsistent" with the Position Statement MPG provided to the EEOC. Papp's position lacks merit.

In its Position Statement, MPG contends that Papp was offered the half-time hospitalist position because he "was the only physician

in the Department trained in neonatology" – a critical skill set for the position – and because "he preferred to see patients earlier in the day so that his appointments ended mid-afternoon," a practice that was judged to be at cross-purposes with MPG's renewed focus on physician accessibility. (Miller Dep. Exh. 6.) Papp claims that testimony offered on behalf of MPG in this case suggests that factors beyond those just indicated were considered, including Papp's "stated goal to retire at age 55," "his wife's job as a cardiologist," and the belief that the hospitalist position might "suit his lifestyle." (Pl.'s Mem. at 5-6, 13.) Papp also notes that Mathewson testified that Papp's tendency to "block" his afternoon schedule was only a "minor" issue and that she "would have made the same decision had the issue not presented itself." (*Id.* at 6; Mathewson Dep. at 84-86.)

In the same way that Papp's desire to retire by age 55 was simply a "sales feature" that made MPG sanguine that Papp would find the hospitalist position enticing (*see* "Direct Evidence," *supra*), the additional factors cited above by Papp served as nothing more than further reasons to believe that Papp might have been *interested* in taking the job, *not* as additional reasons why Papp was thought to be the most qualified physician for that job in the first place. (Def.'s Resp. to Pl.'s Statement of Add'l Facts ¶ 98.) The worst MPG can be accused of here is providing greater detail in its litigation testimony about why it was optimistic that Papp would be inclined to take the hospitalist position. But this is certainly irrelevant to the question of pretext: "where a defendant supplements the explanations it gave in the context of [an] EEOC investigation, but

does not contradict or retract them, no inference of pretext may be drawn." *Pagsuberon v. Chicago Tribune Co.*, 168 F.Supp.2d 893, 897 (N.D.Ill. 2001).

As for Mathewson's testimony about Papp's scheduling habits, although she acknowledged that it was a "minor" issue in her decision to target Papp for the hospitalist position, she nonetheless made clear that it *was* an issue that figured in the calculus (Mathewson Dep. at 86 ("Q: So it [Papp's irregular scheduling habits] really wasn't a factor, correct? A: It was there. It was a minor issue, but it wasn't the driving force, no.")) and that it did raise concerns with respect to Papp's accessibility and MPG's broader goal of increasing patient volume (*Id.* at 23, 77, 80; Miller Dep. at 74-75). And despite Papp's protestations that Mathewson based her belief about Papp's scheduling practices on "faulty premises" (Pl.'s Mem. at 6), Papp offers no evidence whatsoever that Mathewson did not genuinely believe that Papp was engaging in those practices. (*See* Def.'s Resp. to Pl.'s Statement of Add'l Facts ¶ 59); *cf. Jackson*, 176 F.3d at 984 ("In other words, if [the employer] honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless, [the employee] cannot prevail." (internal citations and quotation marks omitted)).

### c. Creation of Hospitalist Position and Decisionmaking Process

Papp goes to great lengths in arguing that Mathewson's conception of the hospitalist position lacked sufficient detail or was otherwise financially wrong-headed and that it was, in any event,

unnecessary and/or unwise (because, for example, Papp was assertedly "the most productive physician in the department") to select him for that position. (*See* Pl.'s Mem. at 6-8, 13-14.) These arguments are one and all attacks on MPG's business judgment that downsizing the pediatrics department to 3.5 full-time physicians, and selecting Papp to fill the half-time hospitalist position based on his neonatology credentials and scheduling habits, was an operationally and fiscally sound course of action. They are not, however, offered to show that MPG did not sincerely believe, for legitimate, non-discriminatory reasons, that Papp was the best candidate for the hospitalist position. The Court will therefore not consider them. *See Castleman*, 959 F.2d at 1422 ("Neither the jury nor this Court is empowered to act as a 'super-personnel department' and decide if [an employer's employment decision] was unwise or unjustified.").

Papp next attempts to highlight what he considers to be "inconsistencies" in the testimony regarding the decision making process that led to the downsizing of the pediatrics department and the selection of Papp for the hospitalist position. His first argument (*see* Pl.'s Mem. at 9) goes as follows: Mathewson testified that it was Nelson who concluded that the pediatrics department could only support 3.5 full-time physicians, and Nelson testified that the only options she considered were reducing the department to 3.5 full-time physicians or eliminating the department altogether. However, the argument continues, Shirley Miller, MPG's director of human resources, "testified that pediatrics was initially scheduled to reduce from 5 FTE's to **3 FTE's** but that Dr. Mathewson was the one who

came up with the concept of a half-time hospital-based position."
(*Id.* (emphasis in original).)

Papp has tried here to generate an inconsistency where, on closer inspection, there is none (or least nothing more than a surface inconsistency). The relevant portion of Miller's testimony is as follows:

> Q:  Were any other alternatives discussed instead of [reducing the department to] 3.5?  Was there ever any discussions about putting two on 67 percent capacity?
> A:  I think, from what Dr. Mathewson relayed to me, originally it was to go from 5 FTEs to 3.  It was in her discussions with Deborah Nelson that Dr. Mathewson came up with the concept of a half-time hospital-based position where she could retain another one of her physicians at least on a half-time basis.

(Miller Dep. at 74.)   The Court is at a loss to see how this is inconsistent with MPG's position. Miller states that, as she recalls matters, Mathewson mentioned to her that the department "originally . . . was to go from 5 FTEs to 3." Papp would ask this Court to interpret Miller's testimony as a statement that the department was definitively committed to cutting two full-time physicians, and therefore that Nelson is being "inconsistent" in claiming that the only options she considered were reducing the department to 3.5 full-time physicians or eliminating the department altogether. This argument is absurd. Nelson obviously means that these were the only *final*, financially tenable options that she considered recommending to the finance committee, not that these were the only options that had ever been imagined and/or discussed at any point throughout the decisional process. Indeed, MPG has never disputed that the option

- 28 -

of reducing the full-time physician staff from 5 to 3 (and from 5 to 4, for that matter) was initially considered and rejected. (*See* Mathewson Aff. ¶ 18; Nelson Dep. at 44; Pl.'s Resp. to Def.'s Statement of Facts ¶ 64.). In the course of rejecting those options, Mathewson came up with the idea of the half-time hospitalist position, and Nelson ultimately gave her blessing that the department could financially sustain 3.5 full-time physicians. Nothing in Miller's testimony is at variance with that explanation of the course of events – an explanation, it must be emphasized, that is overwhelmingly substantiated by the record.

Papp's next feckless attempt at exposing an "inconsistency" in MPG's position begins with a reference to Thomas's testimony that, in implementing an RIF, MPG typically takes into account, *inter alia*, physician productivity (defined by Papp's counsel in the deposition as "revenue generation"). (Thomas Dep. at 34.) Papp also notes that Nelson testified that increasing patient visits was an ongoing goal at MPG, and in particular was a component of MPG's plan to right itself financially in 2000. (Nelson Dep. at 38.) Seizing on these two bits of testimony, Papp claims that "incredibly, Deborah Nelson testified that during the decision-making process, there was no discussion at all about who would be the most productive physicians going forward." (Pl.'s Mem. at 9.) This, however, is simply not what Nelson said at her deposition. Nelson did *not* testify that physician productivity (however defined) was an absent consideration in implementing the RIF; she merely stated that, *during her particular conversation with Mathewson* about the various alternatives

available to implement the RIF, physician productivity was not discussed. As MPG rightly notes, this testimony does not support the conclusion that Mathewson (or any other agent of MPG) failed to consider physician productivity in selecting physicians that would, pending finance committee and board approval, be subject to the RIF. In fact, record evidence (and, indeed, common sense) overwhelmingly supports the conclusion that Mathewson did consider productivity in her deliberations and so, by extension, did MPG's finance committee and board of directors. (*See, e.g.*, Mathewson Dep. 48-49; Mathewson Aff. ¶ 27; Pl.'s Resp. to Def.'s Statement of Facts ¶ 117; Def.'s Resp. to Pl.'s Statement of Add'l Facts ¶ 31.)

### d. Miscellany

Finally, Papp points to a hodgepodge of other assorted "evidence" that he believes could support a finding of pretext. (*See* Pl.'s Mem. at 13-14.) Papp's efforts are utterly unavailing.

For example, Papp refers to the presence of "age notations . . . on the benefits forms for Dr. Papp and other physicians," suggesting that this evinces an insidious age bias at MPG. (*Id.* at 13.) But then Plaintiff himself concedes MPG's legitimate, non-discriminatory explanation for this, *viz.*, that "certain benefits are based upon age or number of years to normal retirement age, [and] certain physicians' ages are occasionally written on benefits documents to assist in the calculation of benefits." (Pl.'s Resp. to Def.'s Statement of Facts ¶ 252.)

As a further example, Papp contends that MPG's explanations are pretextual because MPG has demonstrated a "propensity for terminating

older physicians . . . and hiring younger physicians." (Pl.'s Mem. at 14.) The only "evidence" Papp marshals in support of this argument is the unremarkable fact that over a three-year period seven physicians in MPG's family medicine department who were over the age of 40 (the average age was 47.3) were terminated when the particular facilities at which they practiced were closed or sold. Papp contrasts this with the fact that, over the same time period, twenty family medicine physicians were hired, seventeen of whom were under 40. Papp does nothing more than draw the Court's attention to this empirical data, having provided no analysis of: (i) the reasons behind these hirings and firings; (ii) the question whether any of the affected individuals were similarly situated to one another or to Papp, *see Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002)("Under the law, [a plaintiff] cannot establish pretext by pointing to employees who were not similarly situated to her."); or (iii) the question whether the same decisionmaker was involved in any of these given cases, *see Timms v. Frank*, 953 F.2d 281, 287 (7th Cir. 1992)("[I]t is difficult to say that the difference [in treatment] was more likely than not the result of intentional discrimination when two different decision-makers are involved."). The Court will not provide that analysis for him. *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

None of the evidence that Papp has proffered in this case, either singly or in the aggregate, could allow a reasonable jury to conclude that MPG was motivated by age-based animus in cancelling

Papp's full-time contract and instead offering him a half-time hospitalist position. There is certainly no direct evidence of age discrimination in this case, and Papp's indirect evidence, which consists almost entirely of supposed "inconsistencies" and "incongruities" in MPG's testimony, rests on tendentious (and often tortured) readings of selected excerpts of the record. In the end, this case presents the Court with a straightforward example of a deficit-ridden employer who, with perfectly benign business motivations, reluctantly implemented a reduction in force to right its financial ship. This is no sin under the ADEA.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** and this case is **DISMISSED** in its entirety.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: May 15 2003